**PHOENIX MUTUAL LIFE INSURANCE COMPANY**

v.

**John J. McLEAN.**

**Civ. A. No. 33821.**

United States District Court
E. D. Pennsylvania.
Jan. 30, 1967.

Gordon W. Gerber, Philadelphia, Pa., for plaintiff.

Morris C. Solomon, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

JOHN W. LORD, Jr., District Judge.

After a trial before the Court without a jury, upon pleadings and proof, the Court makes the following:

### FINDINGS OF FACT

1. Plaintiff is Phoenix Mutual Life Insurance Company, a corporation duly incorporated under the laws of the State of Connecticut with its principal place of business there.

2. Defendant, John J. McLean, an individual, is a citizen of Pennsylvania residing in this District at 390 Rittenhouse Street, Norristown, Pennsylvania.

3. The amount in controversy exceeds $10,000 exclusive of interest and costs.

4. From June 3, 1952 until November 11, 1962, defendant was manager of one of plaintiff's Philadelphia agencies, the Keystone Agency (hereafter sometimes referred to simply as the agency). He had been employed by Phoenix on March 16, 1948 and had served as an agent and then as a field supervisor prior to being designated as the Keystone Agency manager.

5. McLean had no written contract with Phoenix as agency manager, but his appointment was confirmed by two letters dated June 3, 1952 (P-33, D-5).

6. As agency manager, McLean had the duty to supervise the business of the agency, to oversee the agents and employees of that office, to see that the agency made proper requests for funds from Phoenix's home office, to see that funds received from the home office were properly disbursed to meet Phoenix's obligations to the personnel of the agency and to others, and to see that moneys due Phoenix submitted by others to McLean or to the agency were properly delivered to Phoenix.

7. In the letter setting forth his appointment as agency manager, McLean's compensation was set at $10,000 per year and the letter states also: "Just as soon as the earnings under the standard formulas of the manager's contract equal or exceed the amount which we are paying to you, you will be compensated accordingly." (P-33).

8. McLean was paid a salary as long as the incentive formula of compensation used by Phoenix to compensate its managers produced an amount lower than the salary. Within a few years after his appointment, the incentive formula of compensation produced higher rates of compensation for McLean and he was thereafter compensated as the Keystone Agency Manager under that formula with which he was thoroughly familiar.

9. All expenses of operating and staffing the agency were paid by plaintiff including rent, telephone, supplies, salaries of office employees and secretarial staff.

10. On November 13, 1958 and June 8, 1961, McLean, acting as the manager of the Keystone Agency of Phoenix Mutual, using stationery of that company and indicating, by his signature as "Manager", that he was acting in his capacity as the employee of that company, prepared written agreements under the terms of which Bernard I. Waters, a Keystone agent, agreed to make payments on account of the cost of office space and secretarial assistance he was receiving at the agency. (P-37, P-38).

11. Bernard I. Waters and McLean signed the letter agreements and Waters made payments to McLean during 1958 through 1962, under the terms of those agreements, totalling $5,287.70 (P-39).

12. The payments from Waters to defendant were made to defendant by Waters at defendant's suggestion and request.

13. The document prepared by McLean for the signature of himself and Waters, dated June 8, 1961 (P-38) states, inter alia, that Waters will "have the full time use of a Secretary, whose salary will be paid for by the Agency * * *.

We will absorb two additional salary increases for your Secretary as they may be justified * * *. In return for the above, it is agreed that your new paid premium production, through the Keystone Agency, will not be less than $45,000 annually, and you will reimburse this Agency to the extent of $1,000 each year * * * ".

14. At no time did McLean advise Phoenix that he intended to receive payments from Waters nor did he advise Phoenix that he had received the payments from Waters described above.

15. McLean had never made any arrangement with any other agent under the terms of which he received and kept payments from an agent on account of services provided for the agent, he had no knowledge of any other agency manager ever having made any such an arrangement with an agent and, until the present case, Phoenix had never heard of any agency manager making any such arrangement with an agent.

16. McLean's compensation was at all relevant times calculated under an incentive formula which included, among its many variable factors, a calculation under which his salary grew higher arithmetically as the expenses of the Keystone Agency grew lower; this, of course, does not mean that the reduction of agency expenses necessarily increased McLean's salary since the incurring of expenses successfully directed at increasing the productivity of the business of the agency increased McLean's salary through other factors in the incentive formula calculation.

17. At all relevant times Phoenix paid the expenses of the Keystone Agency including rental and secretarial salaries. At no time did McLean directly pay any sums for any such purposes and it may not be concluded that McLean indirectly paid any part of those expenses simply because his compensation was calculated on a formula which produced a debit from the expenses of the agency. On the contrary, the agency's expenses, properly directed, produced countervailing credits.

18. McLean has at all times received and kept all compensation from Phoenix which reflected all the increments based upon the favorable calculations made under the incentive formula of compensation for agency managers.

19. McLean has retained the payments of $5,287.70 made by Waters to him.

20. At no time was McLean authorized by plaintiff to keep the payments made to him by Waters.

21. McLean's defense that he is entitled to keep the money he collected from Waters because the cost of the services provided to Waters under the incentive formula of compensating managers lowered McLean's annual compensation is rejected under all the facts of this case.

22. At no time was any additional space rented for Waters nor was any new secretary hired for him. Any services or facilities received by Waters did not, and could not have, in any event, adversely affect McLean's compensation under the incentive formula.

23. From time to time, it was the obligation of the agency to make formal request to the home office for payment for services, commissions and for salary to which employees and contractees of plaintiff working through the agency were entitled. As agency manager, it was McLean's obligation to see that requests for such payment were made only for those persons who were in fact employees or contractees of the agency and who were in fact entitled to the sums of money requested.

24. As agency manager, it was McLean's obligation to make certain that the agency handled incoming checks so that they were delivered to the named payees, including the salesmen and agents of the agency.

25. The requests for payment of agents at the Keystone Agency who were being financed by Phoenix were made on Financing Factor Forms customarily used by Phoenix and its agencies, including the Keystone Agency. There was such a form for each agent being financed and that form shuttled back and forth between the home office and the agency.

26. A summary of Phoenix's procedure in issuing checks for payment of the Keystone agents during the period 1958 through 1962 is as follows: When a Financing Factor Form was received at Phoenix's home office, from the Keystone Agency, the form passed through the Agency Department. If McLean had approved the issuance of financing checks through the transmission of the Financing Factor Form to Phoenix's home office, then the Agency Department at the Home office authorized the Treasury Department, at the home office, to issue the requested checks and it did so. The Financing Factor Form and checks were thereafter sent to the Keystone Agency. Every financing check sent by Phoenix's home office to the Keystone Agency, payable to a supposed agent, was sent only because the home office had received from the Keystone Agency a Financing Factor Form bearing the certification by McLean that the agent was entitled to the payment. The Financing Factor Form was never sent from the Keystone Agency to the home office without the specific authorization of McLean to do so. The financing checks were sent to supposed agents only because his Financing Factor Form was received in the home office. The home office maintained no records which would have precipitated the issuance of a financing check for an agent if McLean as the agency manager had not directed the submission of the Financing Factor Form to the home office with its figures as to the agent's production. The home office's notice of termination of an agent's employment came from the agency through a notice of termination forwarded by the agency manager and through the cessation of any transmission to it by the agency manager of the Financing Factor Form relating to the particular agent.

27. Although the home office would never initiate the issuance of a financing check to an agent, it did exercise authority to terminate the issuance of such

checks even though the agency manager may have certified a request to the home office for the issuance of such checks. The home office, however, applied a different criteria in making its decision. Whereas the agency manager was certifying that the agent was still working for Phoenix and satisfying the agency manager's standards, the home office applied an actuarially computed standard of what total production to date had been achieved by the financed agent. If and when that total production level fell below a specified standard, the home office would not approve further financing payments notwithstanding the agency manager's transmission to the home office of the Financing Factor Form of the agent.

28. On or about the times specified in the following list, the agency, acting through McLean or his expressed authorization, requested payment for the following persons from Phoenix's home office and the checks were sent by Phoenix's home office to the agency:

| Name of Payee | Month Checks Issued (Number of Checks) | Total of Checks |
|---|---|---|
| Herbert R. Belber | July 1958 (1) | $ 138.00 |
| James O. Currie | Nov. 1960 (3) | 319.09 |
| Riccardo L. Garofalo | June 1960 to Aug. 1960 (4) | 576.89 |
| Don L. Heller | May 1961 (1) | 212.15 |
| Mayer L. Kersun | Sept. 1961 (2) | 316.72 |
| Richard J. Parker | Dec. 1960 (1) | 198.45 |
| Lawrence D. Roseman | June to July 1962 (4) | 563.45 |
| Eugene J. Sharpe | Aug. to Oct. 1962 (4) | 631.65 |
| Norton Simons | Dec. 1961 to Mar. 1962 (8) | 1,181.36 |
| Martin P. Webb | Nov. 1961 to Mar. 1962 (7) | 620.21 |
| | (35) | $4,757.97 |

29. The checks listed above were sent by Phoenix's home office to the Keystone Agency only because McLean had authorized the forwarding of the Financing Factor Form of each supposed agent to the home office.

30. From time to time, Phoenix issued commission checks to employees of the agency and such checks were sent to the agency for those persons.

31. On or about the times specified in the following list, payments in the following amounts were sent to the agency for the person listed:

| Name of Payee | Dates of Checks | No. of Checks | Total of Checks |
|---|---|---|---|
| James L. Weintrob | May to Aug. 1962 | (4) | $357.23 |

32. None of the checks set forth in Findings 28 and 31 were delivered to the persons named as payees, except the check dated July 18, 1958 payable to Herbert R. Belber.

33. All of the checks described above (P-1 through P-11) were drawn by Phoenix Mutual, passed through the banks indicated on the checks and were paid by Phoenix through the charging of its account.

34. All of the checks in the above two lists came into the possession of McLean who assumed sole and complete responsibility for the handling of the incoming mail at the Keystone Agency during the period involved in this litigation.

35. Of the checks listed in Findings 28 and 31, I find as a fact that the proceeds of the following checks were diverted by McLean to his own personal benefit:

| Name of Payee | Date checks were issued | | Total |
|---|---|---|---|
| Herbert R. Belber | 7/18/58 | | $ 138.00 |
| James O. Currie | 11/2/60 | – $108.89 | |
| | 11/16/60 | – 108.89 | 217.78 |
| Riccardo L. Garofalo | 7/15/60 | – $109.15 | |
| | 8/1/60 | – 142.99 | |
| | 6/1/60 | – 165.28 | 417.42 |
| Don L. Heller | 5/29/61 | | 212.15 |
| Mayer L. Kersun | 9/8/61 | | 158.36 |
| Lawrence D. Roseman | 6/13/62 | – $143.25 | |
| | 6/27/62 | – 142.15 | |
| | 7/13/62 | – 134.80 | |
| | 7/30/62 | – 143.25 | 563.45 |
| Eugene J. Sharpe | 8/29/62 | – 161.97 | |
| | 9/12/62 | – 150.59 | |
| | 9/28/62 | – 162.17 | |
| | 10/12/62 | – 156.92 | 631.65 |
| Norton Simons | 12/5/61 | – $163.11 | |
| | 12/18/61 | – 142.25 | |
| | 1/29/62 | – 64.10 | |
| | 1/29/62 | – 163.12 | |
| | 2/5/62 | – 163.12 | |
| | 2/20/62 | – 163.12 | |
| | 3/5/62 | – 159.42 | |
| | 3/20/62 | – 163.12 | 1,181.36 |
| Martin P. Webb | 11/9/61 | – $ 11.47 | |
| | 12/8/61 | – 11.47 | |
| | 12/28/61 | – 6.62 | |
| | 1/12/62 | – 11.45 | |
| | 1/25/62 | – 545.46 | 586.47 |
| James L. Weintrob | 5/24/62 | – 54.78 | |
| | 6/20/62 | – 88.99 | |
| | 7/24/62 | – 148.84 | |
| | 8/22/62 | – 64.62 | 357.23 |

36. The diversion of the proceeds of the checks, listed in Finding 35, by McLean to his own personal benefit, occurred as a consequence of the wrongful acts of McLean and through no intentional misconduct or dishonesty on the part of any other person.

37. McLean had an active checking account at the Broad Street Trust Company from December, 1961 through Jan-

uary, 1963 (P-16). McLean had an active checking account at the Industrial Valley Bank & Trust Company from November, 1960 to April, 1962 (P-17).

38. McLean, on occasions, had his secretaries deposit to his personal account checks drawn by Phoenix Mutual to payees other than himself and the depository bank accepted such checks for deposit.

39. McLean, on occasions, had his secretaries cash checks drawn by Phoenix Mutual to payees other than himself, the depository bank cashed such checks and McLean's secretaries either deposited the cash to the credit of McLean's personal account or delivered the proceeds of the checks, in cash, to McLean.

40. I find that during the period 1958 through 1962, not only did McLean obtain the proceeds of checks drawn by Phoenix to agents or former agents through the use of his secretaries to do his banking on his behalf, but also that he diverted the proceeds of some of the checks by personally cashing or depositing them with forged endorsements. I find from the evidence that in many of the instances where deposits were made in McLean's accounts in amounts slightly different from the amounts of a diverted check, that McLean was personally doing his banking and intentionally endeavoring to conceal his diversion to his own use of the proceeds of checks intended for others.

41. In all checks listed in Finding 35, I find that the endorsements were forgeries except for the check dated 7/18/58 drawn to the order of Herbert R. Belber in the sum of $138.00.

42. In all instances where I have found that the endorsement of a payee was a forgery, I find that either McLean was the forger or the forgery was done by another at his direction.

43. In all instances where I have found that the endorsement of a payee was a forgery, I find that McLean diverted to his own personal benefit the funds of Phoenix.

44. I find that McLean diverted to his personal benefit the proceeds of the check of July 18, 1958 payable to Belber in the sum of $138.00 which check was validly endorsed by Belber, at the request of McLean, for return to Phoenix.

45. In addition to the fact that the proceeds of some of the checks involved in this suit were shown to have been improperly diverted into McLean's personal checking accounts, either directly or indirectly, I conclude from the circumstances of the endorsements on a number of other checks, the amounts of deposits in McLean's personal accounts and the absence of records to show the contrary, that McLean improperly diverted all of the checks listed in Finding 35 to his personal benefit.

46. I find as a fact that Phoenix is the real party in interest insofar as each and every check involved in this litigation is concerned. To the extent that the payees were not entitled to the proceeds of the checks issued by Phoenix, Phoenix's funds were diverted. To the extent that the payees were entitled to the proceeds of the checks issued by Phoenix, the obligation of Phoenix to those payees was not satisfied by those checks, Phoenix remained obligated to those payees and again, Phoenix's funds have been diverted. An illustration of the latter category is Weintrob (see Finding 35), to whom Phoenix subsequently paid the amount of the four checks drawn to his order which were not received by him.

47. I reject as unworthy of belief the defense by McLean that he received any of the checks involved in this suit as repayment of loans. I reject as unworthy of belief the defense by McLean that he cashed for the payees any or all of the checks involved in this suit.

48. From time to time prior to November 11, 1962, McLean borrowed from Phoenix sums of money at an interest rate agreed on between the parties.

49. A running account of the loan balance was kept as part of the arrangement between Phoenix and McLean.

50. There is due and owing by McLean to Phoenix on the above loan account, the sum of $5,087.45, which total

includes both principal and interest to the time of trial. (The parties have stipulated as to these figures.)

51. McLean was paid his salary by Phoenix through October, 1962; he was not paid thereafter. McLean is entitled to set-off against plaintiff the sum of $581.13, being salary for eleven days during the month of November, 1962. With legal interest to the date of trial, that set-off is $720.89.

52. There has never been any agreement or custom or policy of Phoenix under which McLean would be entitled to any severance pay or termination pay of any kind.

53. McLean has a right to possession of the furniture and equipment which he purchased and left behind in the Keystone Agency. These items are: one sofa, two Danish chairs, three wooden tables, one straight back chair, one glass front bookcase, one table lamp, one pole lamp, one typewriter with stand and three glass desk and table tops. Further, he is entitled to compensation for deterioration in value of this furniture and equipment from November 11, 1962 to date. The deterioration value is found to be $600.00.

54. McLean is entitled to a credit of $2,972.20 from the management pension fund against the sum due Phoenix; said figure includes both principal and interest to the time of trial.

55. I find that Phoenix is entitled to judgment against McLean in the following sums (figures listed in (a) and (b) below include interest from November 11, 1962 to date of trial):

|  |  |
|---|---|
| (a) Waters transaction ($5,287.70 plus $1,270.89 interest) | $ 6,558.59 |
| (b) Diverted checks ($4,463.87 plus $1,093.65 interest) | 5,557.52 |
| (c) Loan account (as stipulated) | 5,087.45 |
| Total | $17,203.56 |

56. I find that McLean is entitled to set-offs against Phoenix's judgment as follows (figures in (a) and (b) include interest to date of trial):

|  |  |
|---|---|
| (a) Salary ($581.13 plus $139.76 interest) | $ 720.89 |
| (b) Pension account (as stipulated) | 2,972.20 |
| (c) Furniture | 600.00 |
| Total | $4,293.09 |

57. Plaintiff is entitled to judgment against defendant in the sum of $12,910.47 ($17,203.56 less $4,293.09).

## CONCLUSIONS OF LAW

1. Jurisdiction in this action is based upon diversity of citizenship. 28 U.S.C.A. § 1332.

2. The relationship of principal and agent existed between Phoenix Mutual Life Insurance Company and John J. McLean at all times relevant to this action. Restatement (Second), AGENCY § 1 (1958).

3. An agent has a duty of loyalty to his principal. Under Penn-

sylvania law, this duty is as follows: "Unless other-wise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Fox v. Cox, 195 Pa.Super. 119, 121, 169 A.2d 345, 346 (1961) quoting with approval Restatement (Second), AGENCY § 387 (1958). Accord, Kribbs v. Jackson, 387 Pa. 611, 129 A.2d 490 (1957).

■ 4. An agent's duty of loyalty is a fiduciary duty. An agent must always act with the utmost loyalty in protecting the interests of his principal. See, Mechem, OUTLINES AGENCY § 499 (4th ed. 1952).

■ 5. Upon breach of his duty of loyalty, an agent is liable for any loss caused by the breach, including the money which he held and used for his own purposes, the value of the use of his principal's assets which he used in violation of his duty as well as the money he received as a result of his violation of his duty. Restatement (Second), AGENCY §§ 399, 402, 403. Pearl Assur. Co. v. National Ins. Agency, 151 Pa.Super. 146, 30 A.2d 333 (1943).

■ 6. Aside from liability for breach of the duty of loyalty, an agent is liable by way of restitution to his principal for any enrichment which the agent unjustly retained. Restatement (Second), AGENCY § 404A (1958).

■ 7. Agent McLean breached his duty of loyalty to his principal Phoenix in that:

(a) he caused the issuance of checks by Phoenix payable to the order of persons not entitled to receive them;

(b) he diverted from the mail and to himself checks drawn by Phoenix payable to the order of third parties;

(c) he converted to his own use the funds of Phoenix represented by checks drawn to the order of third parties;

(d) he failed to deliver to third parties checks drawn by Phoenix to which said parties were entitled;

(e) he failed to return to Phoenix checks drawn by it to the order of third parties who were not entitled to said checks;

(f) he forged or caused to be forged endorsements on checks drawn by Phoenix to the order of third parties;

(g) he used the assets of Phoenix, including the facilities and services of the Keystone Agency, for his own benefit and personal gain;

(h) he used the assets of Phoenix, including the facilities and services of the Keystone Agency, to the detriment of Phoenix;

(i) he converted the money and assets of Phoenix to his personal use and financial gain;

(j) he concealed from Phoenix his activities as its agent; and

(k) he fraudulently converted to his own use the property of Phoenix.

■ 8. Agent McLean is liable to his principal Phoenix for his breach of his duty of loyalty.

9. Agent McLean is liable by way of restitution to his principal Phoenix for the enrichment which he unjustly retained.

10. In accordance with conclusions 8 and 9, plaintiff is entitled to judgment against defendant in the sum of $12,910.47.

11. Defendant failed to meet the burden of establishing any right to compensation, severance pay or termination pay except in the amount admitted by plaintiff to be due the defendant for the period November 1 to November 11, 1962.

12. Defendant has established that plaintiff has deprived him of his property, specifically the items of furniture and office equipment discussed in finding of fact 53 above, and has established his damages which were found to be in the sum of $600.00. Armstrong & Latta v. City of Philadelphia, 249 Pa. 39, 94 A. 455 (1915); Main Invest. Co. v. Gisolfi, 203 Pa.Super. 244, 199 A.2d 535 (1964).

13. Judgment is hereby entered in favor of Phoenix Mutual Life Insurance Company and against John J. McLean in the sum of $12,910.47.