Bennett LEVIN

v.

Howard N. GARFINKLE, Barbara Garfinkle, Asher Fensterheim, Cyrus West, K. B. Weissman, Edward Breger, Norman Septimus, Jack Deutschmann, Huckleberry Farm, Inc., HAW Corporation, TAFU Corporation, Czar Realty Corporation.

Civ. A. No. 77–3211.

United States District Court,
E. D. Pennsylvania.

Oct. 16, 1980.

See also, D.C., 492 F.Supp. 781.

Patrick Ryan, Mark Wilcox, Philadelphia, Pa., for plaintiff.

Jerome Shestack, David Smith, Philadelphia, Pa., for defendants.

OPINION

LUONGO, District Judge.

Plaintiff Bennett Levin brought this action to recover compensatory and punitive damages from defendants for fraud, mis-

representation, and breach of fiduciary duty in connection with a series of complex real estate transactions in which the parties were involved from 1975 to 1977. The matter was tried in January, 1980, and I filed findings of fact and conclusions of law on June 11, 1980, D.C., 492 F.Supp. 781, in which I ruled that the defendants were liable to Levin for certain specific amounts of money, I further ruled that defendant Garfinkle was liable for breach of fiduciary duty with respect to his bad faith rejection of a wraparound mortgage offered to Levin, through Garfinkle, in his capacity as Levin's agent for the sale of certain properties in Charlotte, North Carolina. Because the record was unclear as to the actual value of the wraparound mortgage,[1] I requested counsel to submit further evidence with respect to this one item. An evidentiary hearing was held on July 28–29, 1980, after which the parties submitted briefs on the legal issues, and proposed findings of fact and conclusions of law.

The following opinion constitutes my findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.

## I. Garfinkle's Breach of Fiduciary Duty

■ At trial, the evidence revealed that in the course of negotiations over the Chatham Square Apartments in Charlotte, the purchasers offered to Levin, through Garfinkle, a wraparound mortgage on the property. The wraparound mortgage to be given to Levin was in addition to a $612,000 purchase money mortgage given to Levin as part of the consideration for the purchase. The purchaser, Investors Economic Systems (IES), was a real estate syndication firm acquiring the property for immediate syndication to investors. Because of Pennsylvania Securities Commission regulations, IES could not both syndicate the property for a fee and hold the wraparound mortgage. It was essential, however, that IES structure the transaction with a wraparound mortgage, because members of the restricted class of potential investors whom it serviced were seeking the kind of immediate tax deductions and deferred return on investment which the wraparound provided. Accordingly, IES offered the wraparound to Levin, without any investment by him.

Garfinkle negotiated with George David of IES over the terms of the wraparound mortgage. Several times Garfinkle agreed to accept it, only later to withdraw his acceptance. Because of strict Pennsylvania Securities Commission regulations, IES was required to prepare detailed offering documents which it could not complete without coming to terms on the wraparound mortgage. Garfinkle was aware of these requirements, and of time deadlines pressuring IES, but refused to give a definite answer with the result that IES offered the wraparound to another party, a fact of which Levin was unaware until he attended the closing. See Findings 168–182, 492 F.Supp. 796, 797.

Garfinkle's explanation of his reasons for refusing the wraparound mortgage was unpersuasive. I concluded that Garfinkle breached his fiduciary duty to Levin because, while acting in his capacity as Levin's agent, he refused, without good cause and without consulting Levin, to acquire an asset of apparent value to Levin. See 492 F.Supp. pp. 811–812.

Although I cautioned counsel that the evidentiary hearing was limited to establishing the value of the wraparound, counsel for defendants have implicitly suggested that since the wraparound has little or no value, Garfinkle could not have breached his fiduciary duty by failing to accept it. Specifically, defendants contend that under the November 8, 1976 agreement between the parties, Garfinkle had the right to approve all mortgages taken back at the sale of the Charlotte properties. This was to prevent Levin from accepting inflated mortgages as a means of rapidly reducing

---

1. Ordinarily, plaintiff's failure clearly to establish the value of such an item would amount to a failure of proof, barring the plaintiff from recovery. Here, however, I expressed to counsel a desire to limit the trial as much as possible to the issue of liability, and even though testimony relevant to damages was heard on a number of items, I considered it unfair to deny counsel the opportunity to submit further evidence on an item which was not focused upon at trial.

his indebtedness to Garfinkle without corresponding value to Garfinkle. Garfinkle, defendants now contend, rejected the wraparound because it had no value, and it was his right to reject it under the agreement.

At this stage in the case, this contention has little credibility. At trial, defendants did not refer to the clause granting Garfinkle complete discretion during negotiations as an "approval" clause. If, in fact, Garfinkle was exercising a contractual right to reject the wraparound mortgage when he refused it, he had the opportunity to so testify, both at his deposition (T. 1012–1016, 1/18/80), and at trial. Rather, his testimony was to the effect that the mortgage was a "tax scam," and that Levin himself made the decision to reject it. *Id.* Finally, the defendants' contention that Garfinkle had the right to reject the wraparound mortgage is also unpersuasive in light of my finding that the wraparound was not a purchase money mortgage subject to the terms of the November 8 agreement,[2] and therefore the approval clause in that agreement was not applicable. *See* discussion *infra.*

Defendants have also reiterated their contention at trial that Garfinkle was justified in rejecting the wraparound because of potential problems with the Internal Revenue Service and the Pennsylvania Securities Commission. However, inasmuch as Levin was a party to the transaction even without taking the wraparound, to a certain extent he was already incurring the risk of an investigation of the transaction. (T. 155, 7/28/80). Indeed, the offering memorandum for the syndication of the property specifically disclosed Levin's involvement and his obligations to the investors, *see* exhibit P–252, and therefore at the very least Levin would have been required to explain his involvement in the syndication even without the wraparound. There is no suggestion in the record that Levin had any

ongoing difficulties with the IRS or the Pennsylvania Securities Commission which would have mandated excessive caution on his part before becoming involved in a complex real estate deal of this kind. The record makes it abundantly clear, however, that it would be in Garfinkle's interest, because of his controversial past, to avoid drawing attention to himself by participating in transactions where the parties were taking an "aggressive" stance with respect to tax deductions. In any event, if Garfinkle perceived risks to Levin, certainly it was incumbent upon Garfinkle to give Levin the opportunity to evaluate such risks for himself.

In short, I reject defendants' suggestion that evidence developed at the hearing held on the value of the wraparound undercuts my original conclusion that Garfinkle breached his fiduciary duty.

## II. *The Terms of the Wraparound Mortgage*

The proposed wraparound which IES offered to Levin was never reduced to writing because of Garfinkle's refusal to come to final terms. This necessarily raises some problems of proof with respect to evaluating the wraparound. Defendants contend that since the wraparound was never reduced to writing, Levin cannot recover damages for its loss, because its terms are too uncertain, and his damages too speculative. To adopt defendants' position would in effect reward Garfinkle's conduct, because it was due to his breach of fiduciary duty that the terms were not reduced to writing. More importantly, a wraparound mortgage was ultimately placed on the property, and plaintiff's witness George David, who negotiated both the wraparound proposed to Garfinkle and the wraparound actually created, was able to testify to the terms of the proposed Levin wraparound by

---

**2.** Even if the wraparound were subject to the November 8 agreement, and Garfinkle felt that it would be unfair to him to accept it on those terms, as a fiduciary it would have been his obligation to bring this conflict to Levin's attention, and either to withdraw as Levin's agent, or to reach some other accommodation. I see no reason why Garfinkle could not have agreed

with Levin to accept the wraparound with the understanding that it would not be treated as a purchase money mortgage under the November 8 agreement. Having undertaken to represent Levin in the sale of the Charlotte properties, it was Garfinkle's obligation to act in Levin's best interest.

referring to the instrument which was created.

The net face value of the wraparound, (value in excess of underlying mortgages) was $1,200,030. The rate of interest was 7.25%, resulting in a net cash flow of $5,407,000,[3] over the thirty–year life of the mortgage. The holder of the wraparound was to receive payments from the mortgagors on the basis of the aggregate indebtedness on the property, and he in turn would make payments to the holders of the underlying mortgages. For the first ten years of the wraparound, payments on the underlying mortgages would be such that the wraparound holder would have a negative cash flow–i. e., the income generated by the wraparound would not be sufficient to meet payments on the underlying mortgages, with the result that the wraparound holder would be required to tap another source of funds in order to make payments on the underlying mortgages. Beginning in the eleventh year, the wraparound would yield a positive cash flow of $54,865, increasing to $396,809 in the twentieth year, and in each of the remaining ten years.

The wraparound also contained certain other significant provisions which had an effect on its value. There was a provision that during the first three years of the wraparound mortgage, the holder could not foreclose if gross rental receipts from the property fell below debt service.

In the wraparound actually placed on the property, there was a clause requiring the holder of the wraparound to satisfy or refinance the purchase money mortgage on the property held by Levin when it fell due. This mortgage was in the amount of $541,213,[4] interest only for ten years, at which time the entire principal became due. Accordingly, in the tenth year of the wraparound, the holder would have to meet a substantial obligation in order to keep the wraparound in force. David testified that

in his discussions with Garfinkle, he suggested combining the wraparound mortgage with the Levin purchase–money mortgage, creating one instrument. It is not clear from David's testimony whether the Levin purchase–money mortgage would have been completely subsumed in the wraparound. It is unlikely that it would have, however, both because the Levin purchase–money mortgage was already agreed upon and treated as a separate item before the wraparound was proposed, and because the Garfinkle interests were entitled to a participating share in the Levin purchase–money mortgage. Although Levin may have been willing, if he were to hold the wraparound, to defer receiving payments on his purchase–money mortgage, it is certain that the Garfinkle interests would not have waived their rights under the purchase–money mortgage. It is reasonable, therefore, to conclude that any holder of the wraparound would be required to make a balloon payment in the tenth year on the Levin purchase–money mortgage of at least $270,606, representing the one–half share of the Garfinkle interests in the Levin purchase–money mortgage.

Another clause in the wraparound actually placed on the property was a prepayment clause giving the mortgagors a twenty–percent discount if the indebtedness were satisfied before the end of the tenth year. When the discount is taken into consideration, the mortgagor could satisfy the wraparound for a payment of approximately $800,000. George David, however, testified without contradiction that the prepayment clause was never a part of his negotiations with Garfinkle, and that IES did not intend to propose such a clause in the wraparound it offered Levin. Defendants contend that the prepayment clause must necessarily have been a part of the negotiations between David and Garfinkle, because it was included in the offering memorandum for

---

**3.** The figure for net cash flow differs from the figure testified to at trial, where the cash flow was simply referred to as being in excess of three million dollars. Finding 174, 492 F.Supp. 796. I accept the five million dollar figure as accurate, because it was arrived at as a result of careful calculations made for purposes of

valuation, and was accepted by the experts for both sides.

**4.** This mortgage was originally to be for $612,000, but was reduced because of adjustments made at closing.

the syndication of the property. This does not follow, because the testimony at trial was clear that the offering memorandum was completed after David and Garfinkle ceased negotiations, and in fact David stopped negotiating with Garfinkle because of the need to come to final terms on the wraparound. Findings 176–178, 492 F.Supp. 796. I accept David's testimony that the prepayment clause was not a part of the wraparound proposed to Levin, and will not consider the impact of such a clause in evaluating the value of the wraparound.

### III. *Applicability of the November 8, 1976 Agreement*

The November 8, 1976 agreement between the parties relating to the sale of the Charlotte properties provided:

> Any and all purchase money notes, mortgages, or Deeds of Trust taken back as part of the consideration for such sales shall reflect you [T.A.F.U. Corporation] as the beneficiary or shall be assigned to you. You shall then grant to me [Levin] a junior interest to the extent of 40% thereof. . . .

The parties later amended the agreement to give Levin a 50% interest. The agreement further provided that Levin's indebtedness to the Garfinkle interests was to be reduced dollar–for–dollar by the face amount of Garfinkle's share of the purchase–money mortgages assigned to Garfinkle at each sale.

Levin contends that the wraparound mortgage was a purchase–money mortgage subject to this agreement, and that if Garfinkle had accepted the wraparound, it would have been assigned to TAFU Corporation, and Levin would have been given credit against his indebtedness in the amount of $600,000 (one–half the 1.2 million face value of the wraparound). For the reasons stated below, I reject this contention.

First, this clause of the November 8 agreement by its own terms applied only to purchase–money mortgages. The purchase–money mortgage on the Chatham Square property, in the amount of $612,000, was already agreed upon, and the agreements of sale signed, before the wraparound was proposed. It was this underlying purchase–money mortgage which was subject to the November 8 agreement, as is evidenced by the fact that it was assigned to HAW Corporation [5] and split into participating shares as called for by the agreement. The wraparound ultimately placed on the property was designated a "purchase–money wraparound," but it exalts form over substance to suggest that the use of this term between third parties is controlling for purposes of determining how the wraparound would have been treated as between Levin and Garfinkle.

The controlling language of the November 8 agreement also provides that the mortgage to be divided must be one "taken back as part of the consideration" for the sale. Here, the consideration for the sale was already agreed upon by the parties before the wraparound was ever proposed. The wraparound was offered to Levin *gratis*, without any investment by him, after the parties had come to terms for the sale of the property. By definition the wraparound could not have been intended to be part of the consideration for the sale of the property, for the sale occurred even though Levin did not receive the wraparound.

Aside from the language of the agreement, none of the testimony at trial reflected that the wraparound was to be a joint item split by Levin and Garfinkle. Rather, the thrust of the testimony was that the wraparound was a separate item offered to Levin alone, albeit through Garfinkle who represented Levin in the course of negotiations for the sale. Moreover, the parties agree that because of the substantial amounts of non–cash income generated by a wraparound, only an individual who has substantial tax loss carryovers can reasonably afford to hold such a mortgage, and there is no evidence in the record that Garfinkle or his corporations would have been in a position to absorb such non–cash income.

Levin contends that defendant Asher Fensterheim conceded at the evidentiary

---

5. HAW Corporation was the successor to TAFU Corporation, and also held by Garfinkle.

hearing on the value of the wraparound that it was subject to the November 8 agreement. A close reading of Fensterheim's testimony reveals that he did not so testify, but only stated that *if* the wraparound were assigned to Garfinkle under the November 8 agreement, Levin would be entitled to credit against his indebtedness for one–half of the face amount of the mortgage. (T. 437, 7/30/80). Fensterheim did not testify that the wraparound was in fact intended to be divided under the November 8 agreement.

### IV. *Measure of Damages*

■ Levin is entitled to damages for loss of the wraparound on the ground that Garfinkle breached his fiduciary duty to Levin. Under Pennsylvania law, which is controlling,[6] Levin is entitled to recover from Garfinkle the losses caused by the breach, or such damages as would under the circumstances most nearly make him whole. *Dubern v. Girard Trust Bank*, 454 F.2d 565, 570 (3d Cir. 1972); *Phoenix Mutual Life Insurance v. McLean*, 263 F.Supp. 246 (E.D. Pa.1967).

Levin stresses that damages should be awarded on the basis of the value of the wraparound to him, personally, taking into account the particular circumstances in which he found himself. I agree that if the wraparound had been subject to the November 8 agreement, I would be required to take into account the effect that credit for the wraparound would have had upon Levin's indebtedness and the subsequent sale of his interest in the purchase–money mortgages under the Uniform Commercial Code. *See* 492 F.Supp. at 816–817. That is not the case, however, and I do not see where Levin's circumstances are otherwise unique. It is true that Levin had substantial tax losses to apply against non–cash income received from the wraparound, but this is relevant only to the extent that it shows Levin was a member of the limited class of persons who can absorb the non–cash income generated by a wraparound. When he did not receive the wraparound, these losses were available to Levin to offset income from other investments, and to offset

the income he derived from his engineering practice, which the tax returns he submitted in evidence show was substantial. If the wraparound had generated substantial amounts of income during its early years, Levin might have successfully advanced the argument that receipt of this income would have solved his persistent cash flow crisis, and allowed him to satisfy his debt to Garfinkle, with the result that his interest in the purchase-money mortgages would have been saved from the default sale. Since the wraparound had a negative net cash flow over the first ten years, Levin's failure to receive it made no difference with respect to his cash crisis.

In short, Levin has not established that he was uniquely situated, and the most that can be said with respect to the wraparound mortgage is that it was an asset of which Levin was deprived by Garfinkle's wrongful conduct, with the appropriate measure of damages being the value of that asset. The expert testimony presented by the parties evaluated the wraparound mortgage in terms of its market value as an investment opportunity, and I am satisfied that this is the correct standard, both because it is speculative to assume that Levin would have been the holder of the mortgage for its entire thirty–year life, and because the market valuation approach adequately takes into account the income stream produced by the wraparound by evaluating projected income in terms of present value to the investor.

### V. *Valuation of the Wraparound*

Levin presented two experts at trial. Joseph Jayson, founder of a real estate investment firm, evaluated the wraparound mortgage in terms of its rate of return and by comparing its face value against income, concluded that it would yield a simple return of 13 percent (as an average over the life of the wraparound). Jayson testified that this was an acceptable rate of return to an investor in 1977, and that the market value of the wraparound was therefore equal to its face value of $1.2 million, or slightly higher. George David, who syndi-

---

**6.** 492 F.Supp. at 805 n. 5.

cates real estate for investors, (and who was also a fact witness at the trial), evaluated the wraparound by calculating the cash flow generated by the wraparound over its thirty year life, and applying a present worth factor to discount the total cash flow to its present value. David arrived at a value of $1,112,993. Neither Jayson nor David took into consideration the value of the underlying property, or the clauses in the wraparound limiting foreclosure and requiring payment of the Levin purchase–money mortgage.

Garfinkle presented the testimony of Jerome Block, vice–president in charge of appraisals for a large real estate consulting firm. Block applied the same method as David in evaluating the wraparound–*i. e.*, he applied a present worth factor to the cash flow generated by the wraparound and calculated the present value of the income to an investor. Block also appraised the property which was subject to the wraparound, and considered the depressing effect of the unusual clauses in the mortgage noted above. Block concluded that the present value of the cash generated by the mortgage was $264,214, but that in the final analysis the mortgage completely lacked value because the underlying property could not support the debt, and because particular clauses in the instrument created too great a risk for the holder. I accept the present worth method employed by both David and Block as a reasonable method for evaluating the value of the mortgage to an investor in 1977.[7] I also accept Block's opinion as an appraiser that to properly evaluate the wraparound, the underlying value of the real estate must be taken into account, as well as the two clauses in the mortgage which ostensibly make it less desirable to its holder.

The only point of disagreement between David and Block in determining the present value of the cash flow is what present worth factor should be applied. The interest rate on the wraparound is 7.25%, and David therefore employed that as the present worth factor at which to discount the payments received by the holder of the wraparound. Block, in contrast, employed 15% as the present worth factor, on the theory that since the wraparound mortgage was subordinate to several superior mortgages, a prudent investor would expect a higher rate of interest than 7.25% to justify investing in it, and a higher discount factor would more realistically reflect the value of the wraparound to an investor considering its purchase. The importance of the present worth factor is demonstrated by the experts' respective conclusions: David–$1,112,993; Block–$264,214.

Having considered the reasons offered by both David and Block for the discount factor chosen, I am persuaded that Block's figure of 15% is a more realistic one for evaluating this particular wraparound mortgage. David's figure of 7.25% is predicated on the theory that a wraparound mortgage is akin to a first–priority purchase-money mortgage. This tends to be the case when interest rates are high, or mortgage money scarce, and a seller takes back a wraparound in order to induce a buyer to close the deal. In such cases, there is substantial equity in the property above the existing indebtedness. Likewise, there is more security in a wraparound than in a conventional second or third mortgage because the holder of the wraparound controls debt service on the property, since payments reflecting the entire indebtedness of the property are made directly to him, and he in turn pays the senior lienholders. But much of Levin's evidence on the characteristics and desirability of the wraparound was hearsay in the form of written brochures and government publications which contained general observations about wraparounds as a type of investment, not testimony about the particular wraparound before me in the instant case. When *this* wraparound is evaluated in light of its clauses, and in light of the property which secured it, I am not persuaded that it is realistic to discount the cash flow by a factor as low as 7.25%.

---

7. The method involved in estimating present worth is essentially a cumulative interest calculation. It determines the amount of money an investor would need to invest in present dollars, at a given rate of interest, to generate payments over a period of time in the future.

The Chatham Square property was already mortgaged for $3.5 million before the wraparound was proposed. The experts agreed that as a general proposition, a prudent lender would not lend when existing indebtedness exceeded 85% of the appraised value of the property. Block appraised the property at $3.5 million. Even if one concludes that this appraisal was too conservative, the parties to the sale, all of whom the trial record reflects were experienced businessmen, agreed upon $3.9 million as fair consideration for the property. Because the existing indebtedness was almost equal to value, I question whether there was sufficient value in the property to secure the wraparound, which was subordinate to the existing liens.[8]

Levin's expert David testified that the property could support the wraparound, since, regardless of the property's market value, the wraparound was structured with minimal payments in its earlier years, such that debt service on the property would increase only marginally because of the addition of the wraparound—from $379,000 to $385,000. Furthermore, he pointed out that the property has been able to carry its debt service with the wraparound mortgage since 1977.

Block attributed the property's ability to sustain itself to its owners' risky management practice of diverting funds from capital preservation into debt service. According to Block, the property was in need of significant repairs, and sufficient funds for routine maintenance, repair, insurance, and management were not reserved in the operating budget. Block based this opinion on an inspection of the property, and a comparison of the Chatham Square operating budget with a compendium of average property management expenses published by the Institute of Real Estate Management, which he identified as an accepted tool in his profession for evaluating expenses in property management.

I am persuaded that there is some doubt about whether the Chatham Square property can support its heavy debt structure, and that this affects the value of the wraparound in two ways. First, it is quite clear that if the property were foreclosed upon during the early years of the wraparound, there would not be sufficient value in the property to satisfy the claims of both the senior lienholders and the holder of the wraparound. As noted above, the negotiated sale price reflected that the true market value of the property is at most approximately $4 million, and upon foreclosure most of this would be absorbed by costs and by the senior lienholders. It is true that over time, as the underlying mortgages are amortized and ultimately satisfied, the position of the wraparound holder would become more secure (assuming that the property does not decrease in value). In the early years, however, if foreclosure were to occur, there would not be adequate security to protect the wraparound holder's interest. In effect, the wraparound is structured in such a way as to require its holder to gamble that income from the property will be sufficient to meet debt service at least until the underlying liens are satisfied and the wraparound becomes the first lien on the property.

Second, I accept Block's testimony that the owners of the property are not allocating adequate funds for its preservation. It is quite clear that the investors were interested in the property primarily as a tax shelter, and that the syndication was in many respects a gamble which counted on income from the property meeting debt service. It is therefore not difficult to believe that they would cut corners in property management to ensure that income would be available to carry the heavy debt structure. This affects the wraparound holder's security in two ways. First, physical deterioration of the property plainly reduces the value of the property and thus the security of the wraparound holder in the event of a foreclosure. Second, to the extent that the property is improperly managed, it may have difficulty in attracting tenants, increasing the chances of foreclosure. In-

---

8. The wraparound was a non—recourse mortgage, which provided that the holder could look only to the property itself for satisfaction of the note.

deed, one of the reasons Levin bought controlling interest in the Charlotte properties from Garfinkle was because improper management had created a high vacancy rate, threatening the flow of income from the property.

Another element which must be considered in valuing the wraparound is the requirement of a balloon payment on the Levin purchase–money mortgage. As noted above, for purposes of valuation, I am assuming that even if Levin were the holder of the wraparound, there would be a clause requiring a balloon payment on the Levin purchase–money mortgage. Levin's purchase–money mortgage was in the amount of $541,213. Although Levin would probably have agreed to strike this clause from the wraparound, because as holder of both mortgages it would be absurd for him to pay himself, I do not accept that the Garfinkle interests would have waived their right to a payment on their one–half share. Therefore, the holder of the wraparound, in its tenth year, would either have to make at least a $270,606 cash payment on the Levin mortgage, (representing the Garfinkle one–half interest), or would have to find new financing for that amount.

The balloon payment is required at the worst possible time for the holder of the wraparound, because after ten years the holder still has not realized any profit from the cash flow of the wraparound, as all of the money up to that point would have been paid out on the underlying mortgages. The requirement of a balloon payment scarcely makes the wraparound worthless, because the holder still stands to enjoy a substantial cash flow in the future. It does, however, have a depressing effect on its value.

Another clause in the wraparound provided that its holder could not foreclose on the property during the first three years of the mortgage if gross rental receipts from the property fell below debt service. Garfinkle's own expert projected gross rental income at over $650,000, whereas debt service even with the wraparound was only $385,000. Plainly, by the time gross rental receipts fell below $385,000, a senior lienholder would already have foreclosed on the property, and therefore the non–foreclosure clause would have little if any practical effect.

Taking these elements into account, I am persuaded that whatever may be true of wraparound mortgages generally, the wraparound offered to Levin was more in the nature of a conventional second mortgage than a first mortgage, and that it is unrealistic to discount the wraparound to present worth by a factor of only 7.25%.

Levin contends that the wraparound's subordinate position was reflected in the 7.25% interest rate, in that this rate was higher than several of the superior liens on the property. For purposes of considering market value, this is not a pertinent comparison to make. Rather, the relevant inquiry is what other comparable investments would have been available to an investor exploring the market in April of 1977. Evidence presented at trial by an officer of Continental Bank established that in any week of April, 1977, an investor could have invested in Federal National Mortgage Association ("Fannie Mae") bonds, which are not subject to any risk short of the collapse of the federal government, at rates higher than that of the wraparound: 7.69%, 7.56%, 7.42%, and 7.51%. Given the availability of risk–free investments like a Fannie Mae bond, relatively few investors would find the wraparound, with its much less secure position, to be an attractive investment at a rate of only 7.25%. Consequently, the present worth of the wraparound's hefty cash flow is much less than it first appears, and in calculating its market value according to a cash flow formula, I am convinced that a higher discount factor is appropriate.

Garfinkle's expert Block testified that the wraparound should be discounted by a factor of 15%, but that when the various clauses are taken into account, the mortgage has no value at all. I am not persuaded that the mortgage has no value. In Block's original evaluation of the wraparound, he did not identify the clauses unfavorable to its holder as making it completely devoid of value. It was only after counsel emphasized these clauses that Block came to this conclusion.

Moreover, Block conceded that the impact of the clauses and questions as to underlying value could not be quantified in terms of dollars. Plainly, if the property sustains itself, and there is no foreclosure in the early years, the holder of the wraparound has a valuable asset. The wraparound would prove to be worthless only if there were an early foreclosure, and although there is some risk of such an outcome, it is not so great as to make investment in the wraparound foolhardy. Likewise, the balloon payment is an undesirable feature, but by making the balloon payment, the holder of the wraparound secures the right to enjoy the hefty cash flow of the wraparound in its later years, and he need not make the payment until the tenth year, when he can evaluate his security and probably make a knowledgeable prediction as to whether the property will be able to sustain itself for the duration of the mortgage. Block himself conceded that certain types of investors could be found to "gamble" on such an investment.

Interest rates for conventional second mortgages in April, 1977, ranged from thirteen to fifteen percent. If I had no doubt about the underlying value of the Chatham Square property, and if there were no clauses in the wraparound which depressed its value, I would discount the cash flow at the lower end of the range of interest rates for second mortgages. Because of the particular characteristics of this wraparound, however, I am persuaded that a discount factor at the upper end of range for second mortgages is appropriate. Accordingly, I conclude that the market value of the wraparound mortgage offered to Levin should be derived by discounting the income stream by a factor of 15%. Applying this factor to the cash flow from the wraparound, the present value of the income generated by the wraparound mortgage, and its market value, is $264,214.

Judgment in that amount will be entered in favor of Levin, against defendant Howard Garfinkle for the value of the wraparound mortgage.