IPI LIBERTY VILLAGE ASSOCIATES,
et al., Appellants,

v.

SPALDING CORNERS ASSOCIATES,
et al., Respondents.

No. WD 39273.

Missouri Court of Appeals,
Western District.

May 10, 1988.

Thomas R. Larson, Kansas City, for appellants.

Robert M. Modeer, Kansas City, for respondents.

Before KENNEDY, C.J., and
MANFORD and BERREY, JJ.

KENNEDY, Chief Judge.

IPI Liberty Village Associates, a California limited partnership, brings this suit to set aside what it claims was the wrongful sale in foreclosure of a mobile home park owned by it. The buyer at the August 1, 1986, foreclosure sale was Spalding Corners Associates, another California limited partnership, which is one of the defendants in the case—although the trustee's deed ran to the owners of the note secured by the foreclosed deed of trust, in proportion to their respective ownerships therein, to wit, Spalding Corners 58.34 percent, Dyanna S. Wong 22.22 percent, and Jansen P. Wong (Dyanna's ex-husband) 19.44 percent.

From an adverse judgment upon a trial to the court, Liberty Village appeals.

The background facts are as follows:

Liberty Village purchased the mobile home park in Clay County from Westwind Associates, yet a third California limited partnership, for an agreed purchase price of $955,000. Both Westwind Associates and Spalding Corners Associates were affiliated with Tandem Affiliates Group, and all were under the direction and control of William E. Cavanaugh and Norman I. Tatch. Liberty Village, on the other hand,

was under the direction and control of Dyanna S. Wong. Of the $955,000 price, $100,000 was paid in cash. The balance was represented by a promissory note dated June 24, 1983, for $855,000, running to Tandem Affiliates Group, secured by a purchase money deed of trust on the property. Of this sum, the buyers were to pay $175,000 in installments within 90 days from closing.

After the foregoing payments, the note recited that there remained on the note an indebtedness of $680,000.[1] The buyers were to pay only interest on this sum, in monthly installments, for ten years. The first year's interest rate was 8.09%, and called for monthly payments of $4583.33. The second year's interest rate was 9.56% and called for monthly payments of $5416.67. For the third and fourth years, the interest rate was 11.76%, and called for monthly payments of $6666.67. For the fifth through the tenth years, the interest rate and the monthly interest payments stepped up to another level, but that gets beyond the time that is involved in the present case. The entire principal balance and unpaid interest was due at the end of ten years.

The note was a "wrap note", by which is meant there remained on the property certain liens which were superior to the lien of the deed of trust securing the note which is described above. The holder of the note was obliged to continue to pay those underlying liens as they came due. *See,* e.g., *Goldberg v. Lowe,* 509 F.Supp. 412, 417 (N.D.Miss.1981); *Levin v. Garfinkle,* 499 F.Supp. 1344, 1347 (E.D.Pa.1980). The underlying liens were described in the note as follows:

1. A note and deed of trust to Merchants Bank with an unpaid principal balance of $349,578.80, which was payable at the rate of $3193.59 per month, interest included.

2. A note and second deed of trust to Liberty Village for $67,000, payable annually at a 10% annual rate the first two years and 11% the third year, and the principal payable in a lump sum at the end of five years. This would require $6700 per annum for the first year and second year, accruing at the rate of $558.33 per month. For the third and fourth year, the annual interest would be $7370, accruing at the rate of $614.17 per month.

3. The third note, payable to Merchants Bank, was for $83,383.38. It was payable at the rate of $1854.55 per month, inclusive of interest, with the entire unpaid balance due and payable on May 10, 1985. It was secured by a security interest in thirteen mobile homes.

It will be seen that the payments by the buyer on the wrap note were insufficient to meet the payments on the three underlying liens for the first two years. The monthly payments to be made by the sellers on the underlying liens in the first two years (including the monthly accrual of $558.33 on the second note) would be $5606.47 per month, whereas the wrap note payments from the buyer to the seller in the first year were only $4583.33. In the second year, the wrap note payments would be $5416.67 per month. The shortfall would therefore be $12,277.68 in the first year, and in the second year $2,277.60. The monthly payments on the underlying liens in the third and fourth years (including the monthly accrual of $614.17 on the second note) would be $5662.61. In the third and fourth years, the wrap note payments would exceed the payments on the underlying liens by $12,052.32 per year.[2]

The evidence does not show when the Liberty Village-to-Tandem note was assigned, but fairly early in its life it was assigned by Tandem to Spalding Corners Associates to the extent of 58.34 percent; to Dyanna S. Wong to the extent of 22.22 percent; and to Jansen P. Wong to the extent of 19.44 percent. Thus it will be seen that Dyanna, a general partner in IPI Liberty Village Associates, which was the

---

1. A later accounting fixed this indebtedness at $674,337.71 rather than $680,000.

2. Our calculations throughout this opinion are substantially correct, but they are not intended to take the place of results to be obtained by a detailed accounting, and do not bind the parties.

debtor on the note, was also a substantial part owner of the wrap promissory note secured by the lien on the mobile home park.

Dyanna explained how she came to have assigned to her a fractional interest in the promissory note. "And the way I got to be one of the owed as well," she testified, "is I had invested as a limited partner in one of Bill (Cavanaugh) and Norms' (Tatch) partnerships that went bankrupt. And they ... said well, you're going to lose all of your money if you don't sign off this partnership. This is way back before I ever got into this situation. And at the time they were friends, and Bill acted, I guess, as everyone's attorney, so he had gave me some documents to sign which signed me off the Midwest Mobile Home Park partnership, and they said, well, we'll make it up to you later. And the way they made it up to was they assigned a portion of the mortgage from Liberty Village ..."

At the time the transaction was entered into, Dyanna and Tatch and Cavanaugh were on friendly terms, and had had other business deals together. This accounts, no doubt, for the informal way they conducted business between themselves after the initial transaction. After the Liberty Village transaction, a schism developed between Dyanna on the one side and Tatch and Cavanaugh on the other. Their relations turned hostile and continued so.

For two months or so, after the closing of the mobile home park sale, Liberty Village paid the payments to Tandem as called for by the wrap promissory note. Dyanna then discovered that Tandem was not paying the payments on the underlying notes as it was supposed to do under the terms of the wrap note. She proposed to Tandem that Liberty Village make the payments on the underlying debts directly to the obligees thereof, and this proposal was agreed to. From that time forward until the foreclosure Dyanna continued to make the payments directly to the creditors on the underlying notes, and there is no contention that Liberty Village was at any time delinquent in their payment.

On May 10, 1985, the third of the underlying obligations, i.e., the mobile home note to Merchants Bank, had come due and Merchants Bank had demanded payment. This note had been described in the wrap note as having an unpaid balance (as of June 10, 1983) of $83,383.38, payable in monthly installments of $1854.55 until May 10, 1985, when the whole would be due and payable. Liberty Village in payment of the balance owing on the original note executed a new note and security agreement to Merchants Bank, dated May 10, 1985, in the sum of $63,204.46, payable (including interest) in monthly installments of $2200.00. Liberty Village paid $2200 per month on the new note.

Dyanna received a letter from Tandem, dated June 5, 1985, signed by Tatch. (This letter was introduced in evidence by the defendants but has never been filed in this court.) Dyanna's testimony about this letter was that it said "that there is now more coming in on the wrap around note than is owed on the underlying financing, and therefore a separate accounting and account should be maintained for that excess". It also "asks for an additional monthly payment". (The letter we assume was based upon the literal terms of the note, by which in the third year—which would commence on June 24, 1985—the wrap note payments would exceed the total of the payments on the underlying obligations.) The letter contained no complaint about Liberty Village's past performance on the note.

Tandem's position now seems to be that when Liberty Village executed the new mobile home note to Merchants Bank that this constituted a principal payment on the Liberty Village-to-Tandem note, and that Liberty Village would not be entitled to credit on that note for the $2200 monthly payments made by Liberty Village to Merchants Bank—this for the reason that the new note to Merchants Bank was Liberty Village's direct obligation and not Tandem's. If Liberty Village does not receive credit for the $2200 monthly payments, then its monthly payments on the Liberty Village-to-Tandem note have fallen short by $1971.86 per month from June, 1985.

This attempted explanation by Tandem of its claim of default by Liberty Village seems to have originated during the present litigation. In an answer to an interrogatory about when Liberty Village's default originated, Tatch earlier said that the default occurred July 30, 1984, while the balance on the note was $680,000, which was the original indebtedness on the note after the early payments. This date, of course, was long before Liberty Village's execution of the new note to Merchants Bank.

Liberty Village, on the other hand, claims that it is entitled to credit for the $2200 monthly payments to Merchants Bank on the new note. It says the original wrap note contemplates that the underlying obligations might be refinanced when it says: "The total amount of this Note includes the unpaid principal balances of and is subject to and governed by, the provisions contained in and referred to in those certain Promissory Notes, (the "Underlying Notes") herein, *which shall include any replacement thereof* ... (Emphasis added)."

We observe that Tandem could not have given a lien on the mobile homes which secured the Merchants Bank mobile home renewal note when the note came due on May 10, 1985; the titles were now in Liberty Village. Liberty Village, on the other hand, stood to lose the mobile homes if the notes were not in some way satisfied. The interest rate of the new note negotiated by Dyanna was less than the former note—15% per annum as against 15¾%. No one suggests any reason that Tandem was prejudiced by the renewal note, nor did Tandem ever complain about it until sometime during the course of the present litigation. Its complaint is a recent invention.

Accepting Liberty Village's position, it has (by June 30, 1986) overpaid the payments required by the note. An accountant's figures presented at trial indicates that on June 30, 1986, it had paid $215,994.43, whereas the payments called for by the note totalled only $194,262.12.

At some point before the foreclosure was instituted Dyanna had a conference with Tatch and Cavanaugh about the status of the payments under the Liberty Village-to-Tandem note. Who initiated this conference the evidence does not show. Dyanna testified: "Anyway, I know that I mentioned that hey, we've overpaid a lot of money here and I think we've got to do something about this accounting. And they were going to get us how much they thought we owed, and we were going to give them how much we thought we overpaid ..." Neither party pursued the resolution of their difference.

At last Spalding Corners Associates initiated foreclosure of the deed of trust. It was advertised in a weekly newspaper published in Kearney, Missouri. The sale was held August 1, 1986. Dyanna, as we will show later in the opinion, knew nothing about the sale till after it was done. Spalding Corners Associates was the successful bidder, bidding $113,358.72. After giving credit for the amount of the sale proceeds net of sale expenses, the trustee calculated that the deficiency owed by Liberty Village was $158,038.00.

When Dyanna learned about the foreclosure later in August, she promptly initiated suit to set the same aside, with the adverse result noted earlier. Other facts will appear in the course of the opinion.

The foreclosure sale was an ambuscade which equity will not tolerate and delights to remedy.

■ Notice to Liberty Village was inadequate. Sec. 443.325.3(3), RSMo 1986, requires the mailing of a notice of the sale by certified or registered mail to the "grantor named in the deed of trust ... at the foreclosing mortgagee's last known address for said ... grantor."

The foreclosure notice was addressed to: IPI Liberty Village Associates, c/o Dyanna S. Wong, General Partner, 221 Van Tassel Ct., San Anselmo, California 94960. Mailed from Kansas City July 10, 1986, the postoffice attempted to deliver the notice at length and on July 29 returned the letter to the sender with the notation "unclaimed". The address was not the address of IPI Liberty Village Associates. It was the ad-

dress of one of three residences of Dyanna Wong. She was away from that residence during the time the postoffice was attempting to make delivery to her at that address. When she returned to it in the second week of August, she found awaiting her the notice of a registered letter. When she went to claim it, though, the postoffice advised her that the letter had already been returned to the sender. Unknown to her, the foreclosure sale had already taken place on August 1.

Dyanna first learned of the sale when later in August the manager of the mobile home park called her and told her "somebody from Tandem showed up and told them that the park was foreclosed on."

The address of IPI Liberty Village Associates was 145 Natoma, Suite 102, San Francisco California. The Tandem Affiliates Group had regularly addressed correspondence to that address in 1984, 1985 and 1986. Notice of a suit for unlawful detainer was mailed on August 11 to the latter address by the same attorney who had mailed the foreclosure notice to the San Anselmo address. An interrogatory answer by Tatch confirms that the foreclosure notice was the only mail Tandem had ever mailed to the San Anselmo address. The San Anselmo address had been obtained, another interrogatory answer said, from the IPI Liberty Village partnership agreement, which had given that address as Dyanna Wong's address.

■ The failure of Liberty Village to receive the notice would not of itself condemn the foreclosure sale, Sec. 443.325.-3(4), RSMo 1986. It is only necessary that the notice be mailed to the last address of the mortgagor known to the mortgagee. In this case, that address was the Natoma Street address in San Francisco. The aim and purpose of the statute is to require a good faith effort to bring the intended foreclosure sale to the actual notice of the mortgagor, so that he has an opportunity to protect himself. *See Macon–Atlanta State Bank v. Gall*, 666 S.W.2d 934, 939 (Mo.App.1984). Had Dyanna received the notice at her home address, so that she had actual notice of the sale, imputable to Lib-

erty Village, Liberty Village could not claim prejudice from the absence of notice and could not complain that the notice had been wrongly addressed. Strict compliance with the personal notice statute is not a rigid jurisdictional requirement, *Macon–Atlanta State Bank v. Gall, supra,* at 939. In this case, however, Liberty Village never received notice of the intended foreclosure sale by any means and could not protect itself.

■ The failure of the mortgagee to comply with the personal notice requirement of the statute is aggravated by the fact that Liberty Village's default was at all times dubious. Its challenge to Tandem's claim of default was a reasonable one.

There was certainly no default on July 30, 1984, the time when Tatch in his interrogatory answer said the note was in default. There was certainly no default on June 5, 1985, the date of the letter from Tandem to Liberty Village which demanded additional payments. One can only suppose that the demand for additional payments was based upon the terms of the note itself. Had the parties strictly adhered to the payment scheme set up in the note, it is true, as we have shown in an earlier paragraph, that the payments on the Liberty Village-to-Tandem note, beginning June 24, 1985, would have exceeded the payments on the three underlying notes. That, however, overlooks the fact that for two years Liberty Village, by making the payments on the underlying notes, with Tandem's agreement, had substantially overpaid the payments on the Liberty Village-to-Tandem note.

Neither on July 30, 1984, nor on June 5, 1985, was anything said about the refinancing of the Merchants Bank mobile home note. That did not enter into the picture, as noted above, until some time during the course of this litigation.

■ The state of the debt and the discussions between the parties presents a double reason for setting aside this foreclosure sale. There is first the presence of a bona fide dispute between the parties on the

question of default, involving a complicated accounting, with the default being unlikely so far as we are able to see from this record. In such a case, a creditor should not be permitted to proceed with the summary remedy of declaration of default, acceleration and sale under power of sale, without the debtor's opportunity to establish by accounting that he is not in default. *Big Valley, Inc. v. First National Bank of Pulaski County,* 578 S.W.2d 616, 620 (Mo. App.1979). Second, there was the fact that the parties had opened up the question of an accounting between themselves, and had left the matter open pending an accounting. Thus was Liberty Village lulled into a sense of security which prevented its taking the initiative to protect itself from foreclosure. *Morgan v. Bryant,* 673 S.W.2d 129, 130 (Mo.App.1984).

The judgment of the trial court is reversed. The case is remanded for the entry of a new judgment vacating and setting aside the foreclosure sale and the trustee's deed made in pursuance thereof, and restoring the parties to their preforeclosure status.

All concur.